[986 NYS2d 139]

In the Matter of JOHN M. BIGLER (Admitted as JOHN MARTIN BIGLER), an Attorney, Respondent. GRIEVANCE COMMITTEE FOR THE TENTH JUDICIAL DISTRICT, Petitioner.

Second Department, March 26, 2014

### APPEARANCES OF COUNSEL

*Robert A. Green*, Hauppauge (*Mitchell Borkowsky* of counsel), for petitioner.

*John J. Juliano*, East Northport, for respondent.

### OPINION OF THE COURT

Per Curiam.

The Grievance Committee for the Tenth Judicial District served the respondent with a verified petition containing four charges of professional misconduct. The respondent served a verified answer, in which he admitted substantially all of the factual allegations. Following a hearing, which incorporated by reference testimony from the hearing in a related disciplinary proceeding commenced against the respondent's associate, Louis M. Pugliese (*see Matter of Pugliese*, 116 AD3d 167 [2d Dept 2014] [decided herewith]), the Special Referee issued a report in which he sustained all four charges of professional misconduct against the respondent.

The Grievance Committee now moves to confirm the report of the Special Referee to the extent that the charges were sustained, and requests that discipline be imposed accordingly. In this regard, the Grievance Committee disputes the Special Referee's finding that the respondent made, without more, a "serious error in judgment." Counsel for the respondent contends that, to the extent that "any discipline is imposed,"

the Court should exercise leniency, and give "careful consideration" to the Special Referee's findings, including, but not limited to, findings made with respect to the respondent's credibility, and the absence of either venality, solicitation of the subject bequest, or any deliberate pattern of misconduct. Counsel also asks the Court to consider the mitigation offered, including, but not limited to, the respondent's reputation for honesty and integrity, as well as his lack of any prior disciplinary history.

### The Factual Allegations

At all relevant times, the respondent maintained an office for the practice of law (hereinafter the firm) in Wantagh, New York. He employed Pugliese as an associate under his supervision and control, and was aware of Pugliese's activities.

Bernard Goldman was an individual residing in Nassau County. Goldman's sister, Sylvia Fisher, was an individual residing in the Queens Boulevard Extended Care Facility (hereinafter the nursing facility) in Queens County.

On or about November 21, 2006, Goldman retained the firm, and paid the sum of $6,000 to it, to prepare and file an application for medical assistance (hereinafter Medicaid application) on behalf of Fisher with the New York State Department of Social Services (hereinafter the DSS). The respondent delegated the task of preparing and filing Fisher's Medicaid application to Pugliese. Under the respondent's supervision, Pugliese prepared and filed Fisher's Medicaid application, based upon, inter alia, the following information provided by Goldman: Fisher was an 85-year-old widow with no children or other natural objects of her bounty; Fisher had entered the nursing facility in or about March 2006, following hip surgery; Goldman was Fisher's attorney-in-fact, and health care agent, pursuant to a durable general power of attorney and health care proxy, respectively, that previously had been executed by Fisher; as a result of the transfer of Fisher's assets to Goldman, a period of ineligibility for Medicaid benefits would be imposed upon Fisher by the DSS; and Goldman's intent was to use $461,526.48 of Fisher's assets, previously transferred to him by Fisher, to pay for Fisher's residence and care in the nursing facility during any period of ineligibility for Medicaid benefits.

In or about January 2007, the firm completed, and filed with the DSS, the application for Medicaid benefits on behalf of Fisher. Between in or about January 2007 and May 2008, the

firm periodically corresponded with Goldman, and provided the DSS with additional information concerning Fisher's Medicaid application. In a notice of decision dated May 8, 2008, the DSS advised that Fisher would be ineligible for Medicaid benefits for a period of 50.22 months, through August 2010, as a result of the previous transfer of her assets to Goldman.

On or about September 8, 2008, Goldman, now himself a resident of a rehabilitation facility, spoke by telephone with Pugliese, and a social worker from the rehabilitation facility, concerning Goldman's own need for a will, and other advance directives. Goldman was transported to the emergency room at Jamaica Hospital on or about September 15, 2008.

On or about September 16, 2008, Pugliese visited Goldman in the emergency room at Jamaica Hospital, and was apprised, by Goldman, that in addition to the $461,526.48 of Fisher's assets previously transferred to him, his own assets included a home in West Hempstead, New York, worth in excess of $400,000, as well as various bank and securities accounts; that he had two children; and that he wanted his sister to be cared for if he predeceased her. At or about that time, Pugliese returned to the firm's office in Wantagh, and, after consulting with the respondent, drafted a will for Goldman (hereinafter the Goldman will). The primary beneficiary under the Goldman will was a supplemental needs trust (hereinafter the SNT) for the benefit of Fisher. The alternative beneficiaries under the Goldman will were the respondent and Pugliese, as well as Goldman's accountant, Ed Slott. In the event Fisher predeceased Goldman, the respondent and Pugliese would each inherit one third of Goldman's estate. The Goldman will also named the respondent and Pugliese as cotrustees of the SNT, to hold, administer, invest, and reinvest Goldman's assets, and to use the SNT for Fisher's benefit, and supplemental needs, as they, in their sole discretion, deemed necessary and advisable, provided that any distributions from the SNT did not serve to supplant, impair, or diminish Fisher's entitlement to Medicaid benefits. The remainder beneficiaries of the SNT were the respondent and Pugliese, as well as Slott. Under the terms of the SNT, as set forth in the Goldman will, the respondent and Pugliese would each inherit one third of the principal of the SNT. The Goldman will made no reference to Goldman's children, whom Goldman had not seen in approximately 40 years and whom he wished to disinherit. When the firm drafted the Goldman will, the respondent and Pugliese knew or should have known that naming

themselves as fiduciaries and beneficiaries of Goldman's estate or the SNT would give rise to an appearance of impropriety and a presumption of undue influence.

On or about September 16, 2008, the firm also prepared, for Goldman's signature, a durable general power of attorney appointing the respondent and Pugliese as Goldman's attorneys-in-fact, and a health care proxy under which Pugliese was appointed as Goldman's agent, and the respondent was named as substitute agent, for the purpose of making health care decisions for Goldman in the event that Goldman became unable to make such decisions for himself.

On or about September 17, 2008, Pugliese visited Goldman in the emergency room at Jamaica Hospital for the purpose of having him execute the will, power of attorney, and health care proxy. Pugliese was accompanied by the firm's secretary, Nancy Nason, and her friend, Kathleen Bonura. Pugliese did not bring an independent attorney to Jamaica Hospital to review the Goldman will and other documents with Goldman, or to consult with him regarding the will and documents. At that time, under Pugliese's supervision, Goldman executed the will, power of attorney, and health care proxy in the emergency room at Jamaica Hospital. Nason and Bonura executed the last page of the Goldman will as subscribing witnesses, attesting to the fact that Goldman signed the will in their presence. The firm had not prepared, and Nason and Bonura did not execute, witness affidavits rendering their opinions as to Goldman's physical and mental capacity to make the will at that time.

Between September 22, 2008 and September 24, 2008, the respondent and Pugliese discovered that Goldman's assets exceeded $2 million, the bulk of which was contained in a Vanguard investment account. The respondent and Pugliese further discovered that most of Goldman's assets were titled so that they would pass directly to Fisher upon Goldman's death, and not to Goldman's estate under his will. The respondent and Pugliese knew or should have known that, if Goldman's assets passed directly to Fisher upon Goldman's death, and outside of Goldman's will, title to such assets would vest in Fisher, individually, and would not be available to fund the SNT; Fisher's entitlement to Medicaid benefits would likely be postponed or vitiated; Goldman's assets would, upon Fisher's death, be subject to Fisher's own last will and testament, or pass to her heirs as prescribed by statute; and that the respondent and Pugliese would inherit nothing. In order to avoid the

possibility that Fisher would inherit the Vanguard account and that the respondent and Pugliese would inherit nothing, the firm, at or about that time, secured the appropriate paperwork, and arranged for Goldman's Vanguard account to be retitled, so that it would be payable to Goldman's estate upon Goldman's death, rather than directly to Fisher. None of Goldman's other assets was similarly retitled.

On or about October 3, 2008, Goldman died, predeceasing Fisher.

On or about October 8, 2008, the respondent and Pugliese retained the law offices of Ruskin Moscou Faltischek, P.C., to represent them in probating the Goldman will.

On or about December 15, 2008, the respondent and Pugliese secured, and Pugliese notarized, affidavits of attesting witnesses (after death) from Nason and Bonura. At or about that time, the respondent and Pugliese, through their attorneys, filed a petition for the probate of the Goldman will, as well as an application for preliminary letters testamentary, to be issued to them, in the Surrogate's Court, Nassau County. On December 16, 2008, the Surrogate's Court issued preliminary letters testamentary to the respondent and Pugliese.

On or about December 22, 2008 and January 9, 2009, citations and copies of the Goldman will were served upon Goldman's children.

On or about January 22, 2009, Goldman's children appeared in the probate proceeding, by counsel, and indicated their intention to contest the Goldman will.

On or about May 15, 2009, Pugliese was examined under oath by counsel for Goldman's children, pursuant to Surrogate's Court Procedure Act § 1404. The respondent was scheduled to be examined at a similar examination on or about June 16, 2009. The respondent and Pugliese knew or should have known that, given their roles as attorney draftsmen, fiduciaries, and potential beneficiaries under the Goldman will and the SNT, there was a "high risk" that the Goldman will would not be admitted to probate.

In or about June 2009, the respondent and Pugliese, as executors of Goldman's estate, completed an estate inventory, reflecting that Goldman's estate contained probate assets of $3,043,771, which would fund the SNT, and assets in the sum of $559,455 that were not subject to probate (hereinafter the non-probate assets), which passed directly to Fisher by operation of

law upon Goldman's death. By virtue of the $559,455 in nonprobate assets, which passed to Fisher upon Goldman's death, the respondent and Pugliese knew or should have known that Fisher's entitlement to Medicaid benefits would be postponed or vitiated entirely. The respondent and Pugliese also knew or should have known that, given her advanced age, the significant nonprobate assets, now solely in her name, and her lack of any significant "supplemental needs" while in the nursing facility, it was unlikely that Fisher would ever benefit from the SNT. Moreover, the respondent and Pugliese knew or should have known that, if the Goldman will were admitted to probate, they would, upon Fisher's death, inherit a substantial amount of money from the SNT.

In or about June 2009, the respondent and Pugliese, as executors of Goldman's estate, settled the potential claims of Goldman's children by agreeing to pay each of them the sum of $600,000, plus up to $55,000 in legal fees to their counsel.

Between on or about July 27, 2009 and September 23, 2009, a written settlement agreement, dated "as of the __ day of July 2009," was executed by Goldman's children, the respondent, Pugliese, and Slott, in connection with the probate proceeding referable to the Goldman will. The settlement agreement provided that, subject to the approval of the Surrogate's Court, in exchange for $600,000 each, and up to $55,000 to cover their legal fees, Goldman's children would consent to the probate of the propounded will by executing waiver and consent forms, and thereafter waive any further monetary claims against the estate. Simultaneously with their execution of the settlement agreement, Goldman's children executed waivers of process and consents to the probate of the Goldman will, the issuance of letters testamentary, and the issuance of letters of trusteeship to the respondent and Pugliese.

At some point after Goldman's death, Fisher executed a power of attorney appointing the respondent and Pugliese as her attorneys-in-fact.

On or about September 18, 2009, the respondent and Pugliese served a notice of probate on Slott, as a remainder person, and Fisher, as an income beneficiary under the SNT. The notice of probate was mailed to Fisher in care of the director of the nursing facility.

On or about September 25, 2009, the respondent and Pugliese served an amended notice of probate upon Slott, Fisher, and the director of the nursing facility.

At the time when the respondent and Pugliese entered into the settlement agreement with Goldman's children, and served the notice of probate and amended notice of probate upon Fisher, Fisher's affairs were being handled, and her interests were being represented, by the respondent and Pugliese, pursuant to the aforesaid power of attorney.

On or about October 5, 2009, the Surrogate's Court issued a decree admitting the Goldman will to probate, and issued letters testamentary and letters of trusteeship to the respondent and Pugliese, after which the respondent and Pugliese paid Goldman's children the settlement amount out of the "preresiduary" estate.

As Fisher's attorneys-in-fact, and trustees of the SNT, the respondent and Pugliese controlled all of Fisher's and Goldman's assets.

### The Charges against the Respondent

Charge one alleges that the respondent engaged in conduct adversely reflecting on his fitness as a lawyer, in violation of former Code of Professional Responsibility DR 1-102 (a) (7) (22 NYCRR 1200.3 [a] [7]).

Charge two alleges that the respondent engaged in an improper conflict of interest by accepting or continuing employment when the exercise of professional judgment on behalf of his client was or reasonably could have been affected by his own financial, business, property, or personal interests, in violation of former Code of Professional Responsibility DR 5-101 (a) (22 NYCRR 1200.20 [a]).

Charge three alleges that the respondent failed to make reasonable efforts to ensure that his associate Pugliese, a lawyer employed by the respondent's firm and under the respondent's supervision, conformed to the disciplinary rules, in violation of former Code of Professional Responsibility DR 1-104 (a) and (b) (22 NYCRR 1200.5 [a], [b]).

Charge four alleges that the respondent violated the disciplinary rules, which were violated by his associate Pugliese, a lawyer employed by the respondent's firm and under the respondent's supervision, as if the violations had been perpetrated by the respondent, by ordering or directing Pugliese to engage in specific conduct, or, with knowledge of the specific conduct, ratifying that conduct, and failing to take remedial action at a time when its consequences could have been avoided or mitigated, in violation of former Code of Professional Responsibility DR 1-104 (d) (22 NYCRR 1200.5 [d]).

In view of the respondent's admissions, and the evidence adduced, the Special Referee properly sustained all four charges against him. The record reflects a deliberate pattern of conduct designed to promote the interests of the respondent over Goldman's interests, and those of Fisher, the sister whom Goldman sought to protect. The respondent should have, but did not, decline to assign Pugliese to draft the subject will under these circumstances. Although the respondent was aware of the need for Goldman to consult independent counsel, he failed to make more than cursory efforts to secure the same. The Goldman will, which was drafted by Pugliese, under the respondent's direction and supervision, and executed by Goldman, without the benefit of review by independent counsel, reflects omissions potentially inuring to the benefit of the respondent and Pugliese. Specifically, there was no language specifically disinheriting Goldman's children, and there were no descriptive references to the respondent and Pugliese as Goldman's attorneys. Pugliese repeatedly acknowledged that the circumstances surrounding the drafting and execution of the will "did not look good." The Special Referee rejected as "incredible" the explanation that the will was intended to be "temporary." We agree with the Special Referee.

Additionally, the respondent, along with Pugliese, who was acting under the respondent's direction and supervision, suggested the establishment of a special needs trust, of which they were residual legatees, under circumstances where they knew or should have known that Fisher likely never would benefit from it. The respondent, along with Pugliese, who was acting under his direction and supervision, also suggested retitling Goldman's $2 million Vanguard account to fund the SNT, rather than allowing it to pass directly to Fisher, thus optimizing their potential inheritance as residual legatees.

Once Goldman died, the respondent, along with Pugliese, promptly hired counsel to protect their respective interests, even before Goldman's children were notified of their father's death. Ultimately, they paid their counsel out of the gross estate, rather than from their respective legacies of $280,000, or their executor's commission, which was in excess of $50,000.

Goldman's children appeared in Surrogate's Court, ostensibly to file objections to probate of the Goldman will. Following Pugliese's examination under oath in connection therewith, and contrary to Goldman's intent, the prospective objectants received $1.2 million, both delaying and diminishing the fund-

ing of the SNT, which had ostensibly been established for the benefit of Fisher. The respondent had an affirmative obligation, as an executor, to ensure that Goldman's intent was fulfilled. However, he stated that "it [did not] matter what Goldman wanted. He was [not here] and [his] children had a strong case."

In determining the appropriate measure of discipline to impose, we have carefully considered the Special Referee's findings, and the mitigation put forth by the respondent and his counsel, including the respondent's lack of any prior disciplinary history over a lengthy career. We note that, unlike Pugliese, the respondent did not personally make misrepresentations to Goldman, but was responsible in a supervisory capacity for Pugliese's misconduct. However, we also note that, unlike Pugliese, the respondent had no apparent ethical concerns. Rather, he was "grateful" to Goldman, and was disinclined to "look a gift-horse in the mouth." The respondent repeatedly testified that he and Pugliese "did nothing wrong."

Under the totality of the circumstances, the respondent is suspended from the practice of law for a period of two years.

ENG, P.J., MASTRO, RIVERA, DILLON and BALKIN, JJ., concur.

Ordered that the petitioner's motion to confirm the report of the Special Referee is granted to the extent that the charges are sustained; and it is further,

Ordered that the respondent, John M. Bigler, admitted as John Martin Bigler, is suspended from the practice of law for a period of two years, commencing April 25, 2014, and continuing until further order of this Court. The respondent shall not apply for reinstatement earlier than October 25, 2015. In such application, the respondent shall furnish satisfactory proof that during said period he: (1) refrained from practicing or attempting to practice law, (2) fully complied with this order and with the terms and provisions of the written rules governing the conduct of disbarred, suspended, and resigned attorneys (*see* 22 NYCRR 691.10), (3) complied with the applicable continuing legal education requirements of 22 NYCRR 691.11 (c) (2), and (4) otherwise properly conducted himself; and it is further,

Ordered that pursuant to Judiciary Law § 90, during the period of suspension and until the further order of this Court, the respondent, John M. Bigler, admitted as John Martin Bigler, shall desist and refrain from (1) practicing law in any form, either as principal or agent, clerk, or employee of another, (2) appearing as an attorney or counselor-at-law before any court,

judge, justice, board, commission, or other public authority, (3) giving to another an opinion as to the law or its application or any advice in relation thereto, and (4) holding himself out in any way as an attorney and counselor-at-law; and it is further,

Ordered that if the respondent, John M. Bigler, admitted as John Martin Bigler, has been issued a secure pass by the Office of Court Administration, it shall be returned forthwith to the issuing agency and the respondent shall certify to the same in his affidavit of compliance pursuant to 22 NYCRR 691.10 (f).